UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANTHONY VERSCHUEREN,

                Plaintiff,                                  Hon. Ellen S.  Carmody

v.

                                             Case No. 1:13-cv-423

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

## **OPINION**

      This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.  On July 24, 2013, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment.  (Dkt. #11).

      Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive.  The Commissioner has found that Plaintiff is not disabled within the meaning of the Act.  For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence.  Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

1

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 43 years of age on his alleged disability onset date.  (Tr. 286).  He successfully completed high school and previously worked as a newspaper deliverer, machine tender, salvage worker, steel laborer, and yard worker.  (Tr. 37-38, 75).

Plaintiff applied for benefits on January 5, 2010, alleging that he had been disabled since April 10, 2009, due to back pain and nerve damage in his left leg.  (Tr. 286-301, 330). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 125-285).  On March 24, 2011, Plaintiff appeared before ALJ Craig Petersen with testimony being offered by Plaintiff and a vocational expert.  (Tr. 67-121).  In a written decision dated April 4, 2011, the ALJ determined that Plaintiff was not disabled.  (Tr. 156-66).  The Appeals Council subsequently remanded the matter for further consideration.  (Tr. 174-76).

On April 3, 2012, ALJ Petersen held a second administrative hearing at which Plaintiff and Plaintiff's wife testified.  (Tr. 48-66).  In a written decision dated April 17, 2012, the ALJ denied Plaintiff's claim for disability benefits.  (Tr. 27-39).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 6-9).  Plaintiff subsequently initiated this pursuant to 42 U.S.C. § 405(g), seeking judicial review

3

of the ALJ's decision.

The Court further notes that during the pendency of the present applications for benefits, Plaintiff submitted a second SSI claim following a March 27, 2011 heart attack. (Tr. 174). Plaintiff was found disabled as of April 15, 2011. (Tr. 174). Thus, the question presented by the current action is simply whether Plaintiff was disabled between his alleged disability onset date of April 10, 2009, and April 14, 2011. In this respect, the Court notes that Plaintiff's insured status expired on June 30, 2010. (Tr. 29). To be eligible for Disability Insurance Benefits, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On April 10, 2009, Plaintiff was involved in an auto accident after which he began to experience "thoracic and lumbar back pain." (Tr. 443-451). X-rays of Plaintiff's thoracic spine revealed "mild" degenerative changes with "no evidence of fracture or subluxations." (Tr. 552). X-rays of Plaintiff's lumbar spine revealed the following:

> Pedicles are symmetric. Vertebral body heights are maintained, as are the intervertebral disc space heights. There are no subluxations. There are no pars defects. There is no evidence of fracture. The SI joints are patent.

(Tr. 553).

X-rays of Plaintiff's chest were unremarkable with "no acute infiltrates, effusions, or pneumothoraces." (Tr. 554). X-rays of Plaintiff's cervical spine were "unremarkable" with "no fracture, dislocation, or subluxation." (Tr. 555). Moreover, "[t]he intervertebral disc space heights and vertebral body heights are preserved" and "[t]he prevertebral soft-tissues are within normal

4

limits." (Tr. 555). A CT examination of Plaintiff's cervical spine revealed "mild degenerative changes." (Tr. 556). Plaintiff was treated with pain medication and physical therapy. (Tr. 448-50).

X-rays of Plaintiff's lumbar spine, taken May 11, 2009, were "unremarkable." (Tr. 558). An MRI examination of Plaintiff's thoracic spine, performed the same day, was likewise "unremarkable." (Tr. 559). Treatment notes dated May 18, 2009, indicate that Plaintiff's back pain was "resolving" and Plaintiff was cleared to "return to work without restriction." (Tr. 447).

On June 4, 2009, Plaintiff participated in a CT examination of his thorax the results of which revealed the following:

1.  The appearance of the lungs is consistent with emphysematous COPD. There is no evidence of acute pulmonary abnormalities. There is no evidence of abnormal masses or of lymphadenopathy.

2.  There are stable degenerative changes of the spine, with no evidence of acute bone abnormalities.

(Tr. 435-36).

On July 10, 2009, Plaintiff was examined by Dr. Michael Luttropp. (Tr. 441). Plaintiff reported that he was experiencing pain in his thoracic and lumbar spine as well as his right hip. (Tr. 441). Plaintiff reported that his pain was "worse with activity" and was "not yet improving with therapy." (Tr. 441). A musculoskeletal examination revealed the following:

Gait narrow; capable toe and heel walk, station upright. Palpated musculoskeletal tenderness bilateral paraspinal and parathoracic areas. Improving gait, no new areas of tenderness, no areas of gross weakness on exam. Right hip less tender but able to elicit pain on exam. No crepitance.

(Tr. 441).

A neurological examination revealed the following:

5

> cranial nerves II - XII without deficit - normal and equal DTR's - normal bilateral sensation to light touch, proprioception of the great toe, Babinski's[1] - normal function of all myotomes in both lower extremities.

(Tr. 441).  Plaintiff's pain medication regimen was modified and he was instructed to continue participating in physical therapy.  (Tr. 441).

On August 12, 2009, Plaintiff was examined by Dr. Luttropp.  (Tr. 438).  Plaintiff reported that his back pain persisted, but that his hip pain was "diminished."  (Tr. 438).  The results of musculoskeletal and neurological examinations were again unremarkable.  (Tr. 438).  Plaintiff was again instructed to continue participating in physical therapy.  (Tr. 438).  Plaintiff was discharged from physical therapy on August 27, 2009, at which point Plaintiff rated his back pain as 4 on a scale of 1 to 10.  (Tr. 455-56).

On September 24, 2009, Plaintiff was examined by Dr. Patrick Ronan.  (Tr. 485-89).  Plaintiff reported that he was experiencing neck and shoulder pain which he rated as "6-8 on a daily basis."  (Tr. 485).  A physical examination revealed the following:

> General: On examination, the patient presents as a middle-aged mail in no distress.  He stands 6 feet 4 inches tall and weighs 227 pounds.  He is neat and well groomed.
>
> Gait: He walks with a normal gait pattern.  He can rise up on his toes and heels and ambulate without evidence of weakness.
>
> Spine: Inspection of the spine reveals normal contours.  Shoulder and hip heights are symmetric.  Cervical motion is performed through normal functional range with slight discomfort over the left upper trapezius at end range rotation to the left.  There is no

---

[1]   Babinski test is a neurological test designed to discern damage to the central nervous system.  *See* Babinski, available at http://www.medterms.com/script/main/art.asp?articlekey=7171 (last visited on September 23, 2014).

Trendelenburg.[2]  Trunk motion elicits a pulling stretch over the right mid back at end range.  Extension brings out discomfort in this area, traveling downward to the L4-5 level.  Lateral bending to either side elicits minimal symptoms.

Musculoskeletal: Inspection of the neck, upper back and upper limbs reveals no muscle atrophy, bony deformity or skin changes.  There is no palpatory tenderness in the midline over the mid to upper thoracic spinous processes into the neck.  Severe pain is indicated with palpation at the medial inferior border of the right scapula and just below the scapula.  Intensity diminishes upon leaving this area with minimal discomfort in the upper back and minimal symptoms in the soft tissues of the neck.  There is no pain with palpation over the glenohumeral or acromioclavicular joints.  There is no discomfort anterior over the chest.  Muscle tone is normal.  There are no trigger phenomena or other abnormal myofascial hallmarks.

Active shoulder motion is performed slowly, but full without symptoms in a rotator cuff or joint distribution.  Cross adduction is benign.  There is no apprehension and instability.  Good strength is appreciated without pain in a rotator cuff pattern against resisted external rotation.  Impingement is not present.  There is no pain over the biceps tendons with resisted wrist supination.  There is no pain over the medial or lateral epicondyle of either humerus with resisted flexion or extension of the wrist and digits, respectively.

Inspection of the back and lower limbs reveals no muscle atrophy, bony deformity or skin changes.  There is no remarkable discomfort with palpation in the midline or over soft tissues of the low back excluding the site of his injection yesterday.  Muscle tone is normal.  There are no trigger phenomena or other abnormal myofascial hallmarks.  Hip rotation and flexion elicit no symptoms.

Neurologic: The patient is alert and answers all questions appropriately.  Sensation to pin is reported reduced in the right arm relative to the left, but symmetric distal to the elbow.  Sensation to pin in the lower limbs is preserved.  Reflexes are equivalent in the triceps, biceps and brachioradialis tendons in the upper limbs as well as patellar and Achilles' tendons in the lower limbs.  Manual muscle

---

[2]  Trendelenburg's sign assesses the strength of the hip abductors.  *See* Trendelenburg's Sign and Hip Abductor Exercises, available at: http://www.livestrong.com/article/425133-trendelenburgs-sign-and-hip-abductor-exercises/ (last visited on September 23, 2014).  The test is performed in a standing position with your feet shoulder width apart.  You then slowly lift one foot off the ground, balancing on your other foot.  A positive test is when the hip of your non weight-bearing leg drops or is lower than the other side, indicating that the hip abductors on your weight-bearing leg are weak and cannot stabilize your pelvis.  *Id.*

testing reveals normal strength across the joints of all four limbs. Spurling's and straight leg raise elicit no complaints.[3] Circumferential measurements of the arms and forearms reveal no atrophy. Circumferential measurements of the legs are similarly benign, within 1 cm. The left side is slight[ly] smaller than the right.

Vascular: There is mild peripheral edema in the lower limbs. Pulses are normal.

Dermatologic: Skin integrity and color are normal. There are no atrophic changes of the skin or nails.

Imaging: Plain films of the lumbosacral spine April 10, 2009 reveal five lumbar vertebrae. There is no evidence of spondylolysis or spondylolisthesis. Disc space heights are preserved. There are no unremarkable facet changes. Sacroiliac joints are benign.

Plain films of the thoracic spine April 10, 2009 reveal normal alignment. There is no compression fracture or remarkable end plate changes. Mild anterior spurring is noted on multiple levels.

Repeat films of the thoracic and lumbosacral spine May 11, 2009 reveal no change compared to earlier studies.

CT scan of the cervical spine April 10, 2009 reveals no fracture or dislocation. There is no evidence of a disc protrusion.

MRI of the thoracic spine May 11, 2009 reveals normal alignment. There is no compression fracture. There is no disc herniation or compression of neural elements. Spinal cord signal is normal.

There are additional films which predate the motor vehicle accident. Plain films of the cervical spine January 28, 2009 reveal normal alignment with preserved disc heights and no degenerative end plate changes.

Plain films of the thoracic spine January 28, 2009 reveal no change compared to the studies in April and May.

(Tr. 486-87).

---

[3] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited on September 23, 2014).

The doctor concluded as follows:

Mr. Verschueren presents with pain primarily at the right lower scapula off the midline.  The area of discomfort is suspicious for a soft tissue etiology; however, the palpatory examination, although tender, reveals normal objective myofascial hallmarks.  A contusion, strain or tear would have healed.

Examination of the shoulder girdle reveals nothing abnormal.  Range of motion of the shoulders is preserved.  Provocative maneuvers do not implicate pathology in the rotator cuff, shoulder joint or acromioclavicular joint.

Pain from the right scapular area can travel cephalad and actually into the upper limb when fierce, suggestive of a radicular process.  However, pain does not follow a dermatomal pattern.  Review of records did not relate symptoms of cervical radiculopathy.  On today's examination, neurologic findings are benign.  CT scan of the cervical spine reveals nothing compatible with an acute injury such as a disc herniation.  Neural structures are not compromised.

Symptoms spread from the mid back to the low back when fierce, but the patient does not describe specific emanation of symptoms from the low back.  Thigh pain does not follow a dermatome.  Examination reveals normal neurologic findings.

(Tr. 488).

On September 30, 2009, Plaintiff participated in an MRI examination of his cervical spine the results of which revealed "mild" disc bulging with "no significant stenosis or disc herniations." (Tr. 566).  An MRI examination of Plaintiff's lumbar spine, performed the same day, revealed a "small central disc herniation at L5-S1." (Tr. 567).

On October 15, 2009, Plaintiff was examined by Dr. Steven Klafeta.  (Tr. 503-05).  Plaintiff reported that he was experiencing "constant" pain in his neck, back and lower extremities which he rated as "8 out of 10." (Tr. 503).  Plaintiff walked with a "normal" gait and exhibited "normal" lumbar and cervical range of motion.  (Tr. 504).  A neurologic examination revealed the

9

following:

> Cranial nerves II-XII are intact. Motor strength is 5/5 throughout. His deep tendon reflexes are 2 throughout. There is no clonus, no Hoffmann's,[4] no pectorals and no Babinski. His sensation is intact to light touch, pin and vibration in all dermatomes. Decreased vibration in the right hand.

(Tr. 504). The doctor concluded that he "cannot explain" Plaintiff's pain symptoms. (Tr. 504).

X-rays of Plaintiff's thoracic spine, taken October 26, 2009, revealed "minor disc narrowing," but were "otherwise unremarkable." (Tr. 525). An MRI examination of Plaintiff's thoracic spine, performed the same day, was "normal." (Tr. 524).

Treatment notes dated December 9, 2009, indicate that Plaintiff was "most likely" experiencing myofascial pain. (Tr. 536). X-rays of Plaintiff's lumbosacral spine, taken December 28, 2009, revealed "normal" lumbar alignment, "preserved" vertebral body and disc heights, "no pathologic subluxation." (Tr. 574). X-rays of Plaintiff's thoracic spine, taken the same day, revealed "mild degenerative changes" with "no bone injury or destruction." (Tr. 575).

On January 21, 2010, Plaintiff was examined by Dr. Stephen Winston. (Tr. 538-39). Plaintiff reported that he was experiencing "varying issues of unrelenting pain that includes severe back pain, right leg pain with weakness, severe interscapular pain, neck pain and right arm pain." (Tr. 538). In response, the doctor observed the following:

> What is most troubling about this patient is the degree of incapacity experienced. His behavior during today's visit is one of a person with a significant amount of pain behavior and I did explain to the patient and his wife that his pain behavior was excessive irrespective of the amount of underlying pathology. Constant groaning because of pain and the inability to move because of pain is simply odd.

---

[4] Hoffman's sign is an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis. *See* Hoffman's Sign, available at, http://www.mult-sclerosis.org/Hoffmanssign.html (last visited on September 23, 2014).

(Tr. 538).   A physical examination revealed the following:

> Vital signs as noted.  Mental status normal.  Evidence of pain behavior with non organic findings consistent with Waddell's[5] of head down pressure causing pain, trunk rotation with hip rotation causing pain and a lot of pain behavior such as grimacing and groaning with movement of various structures including both arms and both legs.
>
> A focused examination reveals bilateral upper extremity examination to be neurovascular intact for sensory function, motor and reflexes including negative Hoffmann's with normal distal pulses, negative Adson's,[5] as well as a lower extremity examination that demonstrates negative neurologic findings for sensation, motor, reflexes with toes downgoing and no clonus. He arises with some difficulty, walks with a tandem gait with a slight slump forward posture.  His gait is otherwise unremarkable.  He has normal cervical range of motion and the remaining portions of the examination are entirely normal.

(Tr. 539).

On January 28, 2010, Plaintiff participated in a bone scan examination of his spine and thoracic cage the results of which revealed "no focal areas to suggest a thoracic vertebral fracture."  (Tr. 576).

On March 2, 2010, Plaintiff was examined by Dr. Mark Moulton.  (Tr. 623).  Plaintiff reported that he was experiencing "chronic pain" that is "worsened with any type of activity" and which also causes him to experience "nausea and vomiting."  (Tr. 623).  A physical examination revealed the following:

> Physical examination shows a 6 foot-3 inch male.  On motor testing,

---

[5]   A positive Waddell's sign indicates that there exists a non-organic (i.e., psychological or psychosocial) component to an individual's lower back pain.  *See, e.g., A New Sign of Inappropriate Lower Back Pain*, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504150/ (last visited on September 23, 2014); *Assessment and Management of Acute Low Back Pain*, available at http://www.aafp.org/afp/991115ap/2299.html (last visited on September 23, 2014); Gordon Waddell, M.D., *Waddell's Signs - Do they Mean Malingering?*, Disability Medicine, March-June 2004 at 38-39; Steven Greer, M.D. and Leslie Mackler, *What Physical Exam Techniques are Useful to Detect Malingering*, The Journal of Family Practice, August 2005 at 719-22.

[5]   Adson's test is employed to determine the presence of thoracic outlet syndrome.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* A-115 (Matthew Bender) (1996).

> he has 5/5 strength in his iliopsoas, quadriceps, tibialis anterior, EHL, gastoc soleus complex, hamstrings and peroneals bilaterally. He has normal sensation in both lower extremities. Deep tendon reflexes are normal at the knees and the ankles at +2 bilaterally. He has down going toes, no sustained clonus and negative Babinski. He has good dorsalis pedus pulse and posterior tibialis pulse at +2 bilaterally.

(Tr. 623).

X-rays of Plaintiff's thoracic and lumbar spine were "really quite unremarkable" with "no evidence of spondylolisthesis, tumor, fracture or instability" and "no evidence of stenosis." (Tr. 623). The doctor concluded that Plaintiff was not experiencing "an apparent structural problem," but instead simply required "pain management." (Tr. 623).

On March 31, 2010, Plaintiff participated in a consultive examination conducted by David Cashbaugh Jr., LLP. (Tr. 633-38). Plaintiff reported that he was disabled due to "nerve damage in my right leg, pain in my upper back, herniated discs in my lower back." (Tr. 633). Plaintiff reported that "if he tries to do anything, he gets pain in his back, and his blood pressure will shoot way up." (Tr. 633). Plaintiff reported that he was taking Vicodin for his pain. (Tr. 633). The doctor observed that Plaintiff had been prescribed four Vicodin tablets daily, but that a bottle of 21 Vicodin tablets, filled only two days previously, only had six pills left. (Tr. 633). Plaintiff reported that "he is in pain 99% of the time" and that "most of the time his pain level is a 7 or an 8." (Tr. 636). Cashbaugh observed that Plaintiff "was able to remain seated throughout the hour long examination" and "did not appear to be physically uncomfortable while seated." (Tr. 637). Cashbaugh concluded that Plaintiff was experiencing pain disorder associated with both psychological factors and a general medical condition. (Tr. 638).

On May 14, 2010, Plaintiff reported to the emergency room complaining of back pain. (Tr. 657). Plaintiff reported that he was examined at a different emergency department the

12

previous day, but "feels dissatisfied because he does not feel that he received enough pain medication yesterday." (Tr. 657). The results of a physical examination were unremarkable. (Tr. 658-59). Plaintiff was nevertheless provided pain medication after which he was "discharged in stable condition." (Tr. 659).

On November 19, 2010, Plaintiff "underwent balloon angioplasty and stenting," performed by Dr. Craig McBrayer, to repair "acute arterial emboli"[6] that Plaintiff was experiencing in his right lower extremity. (Tr. 646). On December 8, 2010, Plaintiff was examined by Dr. McBrayer. (Tr. 760). A duplex examination revealed "that the area of stenosis has resolved very nicely." (Tr. 760). Plaintiff reported that "his foot feels better" and the doctor observed that Plaintiff's "walking is markedly improved." (Tr. 760).

On February 16, 2011, Physician's Assistant Rebecca Ganzow and Dr. Sotero Ureta completed a Physical Residual Functional Capacity Questionnaire. (Tr. 801-05). The doctor reported that Plaintiff can walk one to two blocks "without rest or severe pain," sit for 30 minutes, and stand for 20 minutes. (Tr. 802). The doctor reported that during an 8-hour workday with normal breaks, Plaintiff can stand/walk "less than 2 hours" and sit for "about 4 hours." (Tr. 803). The doctor reported that Plaintiff required a sit/stand option. (Tr. 803). The doctor reported that Plaintiff can "rarely" lift 10 pounds and can "never" lift 20 pounds or more. (Tr. 803).

On March 27, 2011,[7] Plaintiff reported to the hospital complaining of nausea, vomiting, and shortness of breath. (Tr. 928). Plaintiff exhibited "evidence of congestive heart

---

[6] An arterial embolism results from "a sudden interruption of blood flow to an organ or body part due to a clot (embolus)." *See* Arterial Embolism, available at http://www.pennmedicine.org/encyclopedia/em_DisplayArticle.aspx?gcid=001102&ptid=1 (last visited on September 29, 2014).

[7] This particular record incorrectly identifies the date as April 27, 2011. As the Appeals Council recognized, Plaintiff experienced his heart attack on March 27, 2011, a date which is consistent with the other medical evidence. (Tr. 174).

13

failure at initial presentation" and a subsequent heart catheterization "revealed severe three-vessel coronary artery disease." (Tr. 928). Plaintiff's health, relative to his coronary artery disease, continued to deteriorate throughout 2011. (Tr. 902-35, 942-60).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national

---

[8]1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) lumbar spine pain with lower extremity radiculopthy; (2) upper back pain; (3) cervical spine pain; (4) depression; and (5) obesity, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 30-34).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) he can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) he can frequently push/pull 10 pounds; (3) he can stand/walk for six hours during an 8-hour workday; (4) he can sit for six hours during an 8-hour workday; (5) he can occasionally climb ramps/stairs, but cannot climb ladders, ropes, or scaffolds; (6) he can occasionally stoop, kneel, and crouch, but can never crawl; (7) he should avoid concentrated exposure to heat, humidity, cold, gases, and fumes; (8) he can perform simple, routine, and repetitive tasks; (9) he must work in an environment that is free from fast-paced production requirements; (10) he is limited to work involving only simple, work-related decisions and few, if any, workplace changes.  (Tr. 34-35).

The ALJ found that Plaintiff could not perform his past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a

significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed in the state of Michigan approximately 8,600 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 111-18). The vocational expert further testified that if Plaintiff were further limited to: (1) lifting/carrying no more than 10 pounds; (2) a sit-stand option every 30 minutes; and (3) no overhead work, there still existed approximately 2,800 jobs which Plaintiff could perform. (Tr. 118-19). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

## I.        The ALJ Adjudicated the Correct Time Period

As noted above, Plaintiff was seeking both DIB and SSI benefits. However, because

Plaintiff's insured status expired on June 30, 2010, the time periods relevant to each type of disability claim were distinct. Specifically, the relevant time period for Plaintiff's DIB claim was April 10, 2009, through June 30, 2010. On the other hand, the relevant time period for Plaintiff's SSI claim was April 10, 2009, through April 14, 2011. Plaintiff asserts that he is entitled to relief because the ALJ mistakenly adjudicated only his DIB claim, thereby failing to consider the entire time period relevant to his SSI claim. Plaintiff's claim is based upon an isolated statement in the ALJ's opinion suggesting that the only outstanding issue was whether Plaintiff was entitled to DIB benefits. (Tr. 27).

In articulating the legal standard which governed Plaintiff's disability claims, the ALJ cited to the Code of Federal Regulations provisions applicable to both DIB and SSI claims. (Tr. 28-29). Also, the ALJ expressly considered whether Plaintiff was disabled from April 10, 2009, through April 14, 2011. (Tr. 28, 39). In sum, an examination of the totality of the ALJ's decision persuades the Court that the ALJ adjudicated the appropriate time period. Accordingly, this argument is rejected.

## II.        This Court Lacks the Authority to Review Appeals Council Action

Plaintiff argues that he is entitled to relief because the ALJ "repeatedly violated the Appeals Council's remand order." Plaintiff has failed, however, to cite to *any* authority in support of this argument. The Court has failed to locate any controlling authority that authorizes this Court to review and assess action undertaken by the Appeals Council. The Appeals Council remanded the matter to the ALJ who again denied Plaintiff's claim. Plaintiff appealed this determination to the Appeals Council which denied review. Inherent in this decision is the conclusion that the Appeals

Council was satisfied that the ALJ complied with its previous remand order.

While the Sixth Circuit does not appear to have addressed this particular issue, the Court did locate decisions by other district courts that the district court did possess the authority to pass judgment on whether the ALJ complied with an Appeals Council remand order. *See, e.g., Godbey v. Colvin*, 2014 WL 4437647 (W.D. Ky., Sept. 9, 2014). The Court is not persuaded by this authority, however, as it conflicts with the authority, discussed above, that limits this Court to simply reviewing the ALJ's decision and determining whether such is supported by substantial evidence. On this particular issue, the Court is more persuaded by the conclusion reached by the Honorable Joseph G. Scoville that "the scope of the Court's review is defined by statute and does not encompass the Appeals Council's discretionary decision whether to grant review." *Porterfield v. Commissioner of Social Security*, 2014 WL 1329410 at *3 (W.D. Mich., Mar. 28, 2014). Accordingly, this argument is rejected.

### III.        The ALJ's Treatment of the Lay Witness Testimony is not a Basis for Relief

Plaintiff's wife testified at the second administrative hearing. (Tr. 60-65). The ALJ, however, did not address in his second opinion this particular testimony and the weight he afforded such. Plaintiff asserts that this error entitles him to relief. Plaintiff's wife testified that Plaintiff experiences "difficulty functioning." (Tr. 60-65). Her testimony, however, was vague and nonspecific regarding the extent of Plaintiff's functional limitations. (Tr. 60-65). While the ALJ is generally required to comment upon lay witness testimony, the failure to do so is harmless unless a reasonable ALJ "could have reached a different disability determination *based on* [the lay witness] testimony." *Maloney v. Commissioner of Social Security*, 480 Fed. Appx. 804, 810 (6th Cir., May

18

15, 2012). It is not reasonable to conclude that a reasonable ALJ could have reached a different conclusion based on the testimony of Plaintiff's wife. Accordingly, this argument is rejected.

**IV.          The ALJ's Step II Finding, as well as his RFC Determination, are not Supported by Substantial Evidence**

Plaintiff next asserts that he is entitled to relief because the ALJ found that his "cardiac condition was not severe during the relevant time period." At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Kirkland v. Commissioner of Social Security*, 528 Fed. Appx. 425, 427 (6th Cir., May 22, 2013) ("so long as the ALJ considers all the individual's impairments, the failure to find additional severe impairments. . .does not constitute reversible error").

While the ALJ determined that Plaintiff suffered from a severe impairment at step two of the sequential analysis and continued with the remaining steps thereof, the ALJ's decision belies any argument that he considered the entire record or all the impairments from which Plaintiff suffers. Specifically, the ALJ made no mention in his opinion of the additional evidence concerning Plaintiff's heart attack and subsequent treatment for his cardiovascular condition. That the ALJ failed to consider or account for Plaintiff's cardiovascular impairment is amply demonstrated by the fact that the ALJ, in his two decisions in this matter, articulated the exact same RFC in both

decisions.  In other words, the ALJ determined that despite having suffered a heart attack, which according to the Commissioner rendered Plaintiff completely disabled, such did not diminish Plaintiff's ability to perform work activities.  This determination is not supported by substantial evidence.  In sum, neither the ALJ's Step II findings nor his RFC determination are supported by substantial evidence.

## V.	The ALJ's Assessment of Dr. Ureta's Opinions is not Supported by Substantial Evidence

Plaintiff also argues that he is entitled to relief because the ALJ failed to properly assess the opinions of his treating physician, Dr. Ureta.  The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record."  *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data."  *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991

WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

As noted above, on February 16, 2011, Dr. Ureta and Physician's Assistant Ganzow completed a report concerning Plaintiff's residual functional capacity, concluding that Plaintiff was much more limited than recognized by the ALJ. The ALJ completely rejected these opinions on the ground that the report was completed by an unacceptable medical source and "is not supported by the majority of objective findings of record and other qualified medical opinions." (Tr. 37).

First, while a physician's assistant is not an acceptable medical source, a medical doctor is an acceptable source. *See*, *e.g.*, 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). The report in question was clearly signed by Dr. Ureta. (Tr. 805). Moreover, there is neither evidence nor suggestion that Dr. Ureta did not participate in this assessment or that the opinions expressed therein are not his own. The ALJ also rejected the opinions in question on the ground that such are "not supported by the majority of objective findings of record and other qualified medical opinions." As previously noted, simply asserting that a doctor's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77. Accordingly, the Court finds that the ALJ's rationale for rejecting Dr. Ureta's opinions is not supported by substantial evidence.

## VI.          Remand is Appropriate

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved

and proof of disability is compelling).  While the ALJ's decision is not supported by substantial evidence, there does not exist *compelling* evidence that Plaintiff is disabled.  In sum, evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance.  Specifically, a finding regarding Plaintiff's RFC must be made after which it must be determined whether there exist a significant number of jobs which Plaintiff could perform consistent with his RFC.  Accordingly, the Commissioner's decision must be reversed and this matter remanded for further factual findings.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence.  Accordingly, the Commissioner's decision is **reversed and the matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.  A judgment consistent with this opinion will enter.

Date:  September 30, 2014          /s/ Ellen S. Carmody
                                   ELLEN S. CARMODY
                                   United States Magistrate Judge